No. 97-568

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 295

STATE OF MONTANA,

Plaintiff and Respondent,

v.

RICHARD G. FLATLEY,

Defendant and Appellant.

APPEAL FROM: District Court of the Fifth Judicial District,

In and for the County of Jefferson,

The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jack H. Morris, Jardine & Morris, Whitehall, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Patricia J. Jordan,

Assistant Attorney General, Helena, Montana

Valerie D. Wilson, Jefferson County Attorney, Boulder, Montana

Submitted on Briefs: December 16, 1999
Decided: November 30, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 By Information filed in the District Court for the Fifth Judicial District in Jefferson County, the Defendant, Richard Flatley, was charged with criminal sale of dangerous drugs by accountability, a felony, in violation of §§ 45-9-101, 45-2-301, and -302, MCA. At the close of the State's case, Flately moved the District Court to dismiss the action based on insufficient evidence. The District Court denied Flately's motion and he was subsequently convicted. Flately appeals the District Court's denial of his motion to dismiss. We reverse the judgment of the District Court.

¶2 Although a number of issues were raised on appeal, we find the following issue dispositive:

¶3 Did the District Court err when it denied the Defendant's motion to dismiss based on insufficient evidence?

## FACTUAL BACKGROUND

¶4 Alan Real agreed with Ray Malley, an agent for the Southwest Montana Drug Task Force, to arrange a drug purchase from the Defendant, Richard Flatley, who was an acquaintance of Real's. Real testified that he tried to call Flatley five or six times and left several messages, but that Flately did not return his calls. When Real eventually contacted Flately, Real testified that the following conversation occurred:

Q. And what happened?

A. Told him I was going to Boulder that night, the night that I was coming over; and he said, "Well, come on over."

Q. Okay. And what did you do then?

A. Then I got hold of the Southwest Drug Task Force.

Q. Okay. Did you tell anyone from the Southwest Drug Task Force that Rick Flately said, "I could buy a quarter ounce of marijuana in Boulder for $65?"

A. I told them that I could buy one over there. But, and I also told them that Rick Flately said that. But Rick Flatley never said that.

Q. Why did you tell them that then?

A. Because they wanted me to set Rick Flatley up. And I know when I go to Boulder, nine times out of ten I can get a bag of marijuana.

¶5 On June 6, 1996, Real met with Agent Timothy Barkell and Agent Malley of the drug task force in Whitehall, Montana. Real and Barkell drove from Whitehall to Boulder, Montana in Barkell's car. Malley followed in his car. When they arrived in Boulder, Barkell fixed a wire on Real's body.[1] After Real identified Flatley's house, Barkell parked his car in Flatley's driveway and remained in the car. Malley was parked half a block away, where he was listening to the transmission of Real's conversation and taking photographs.

¶6 Real then exited Barkell's car and walked to the back of the house, where Flatley and Lucas Janacaro were repairing a car. Real testified that he asked Flatley, "Well, can you hook me up?" to which, Flatley responded, "No, the guy's gone fishing." Real testified that he then asked Janacaro if he could help him get some marijuana; and that Janacaro responded, "we have to go to Jefferson City because I want to get some for myself too. So can you guys give me a ride?" The recording device that Real was wearing recorded the conversation as follows:

Flatley: So how long are you going to be in town?

Real: Oh, not long hopefully.

Flatley: No Shit.

Real: Yeah.

Flatley: That dude's gone.

Real: Oh, he is?

Flatley: Yeah, he's up fishing.

Real: Can you hook me up?

Janacaro: Yeah.

Real: How much per quarter?

Janacaro: For a quarter, um, we can go to Jefferson City and it's sixty-five at Jefferson City. They're pretty fat.

Janacaro testified that Flatley did not introduce him to Real; and that Flatley did not tell Real that he could get him drugs. Real testified:

Q. Okay. And isn't it true that then Mr. Flatley never directed Mr. Real to ask you about getting hooked up; correct.

. . . .

A. Right, correct.

Following the conversation in Flatley's yard, Real, Flatley, and Janacaro walked to the car where Barkell was waiting. Barkell testified that the following conversation resulted:

A. They came out, and [Real] introduced me as his uncle. [Flatley] asked if I was looking for some marijuana, and I said yeah. And he said, "how much?" And I said, "I'd like to get an ounce." And then I believe he said he didn't believe he could get an ounce at this time but could get a quarter ounce. And [] Janacaro joined in and said, "Yeah, we can get a quarter ounce."

. . . .

Q. Did they say where they could get the marijuana?

A. They told me we could go to Jefferson City if I'd give them a ride; and if we couldn't get it in Jefferson City, we could go to Helena.

Q. Okay, and when you say "they", do you recall specifically who was talking?

A. Rick [Flatley] and Lucas [Janacaro].

Q. Both of them were talking to you?

A. Right.

¶7 Before they left for Jefferson City, Real testified that Barkell suggested that Janacaro call the supplier. Janacaro testified that Flatley also suggested calling the supplier. Janacaro, however, responded that the supplier did not have a phone. While driving to Jefferson City, Barkell testified the following conversation occurred:

Q. Okay. Now on the way over there, did you have some conversation about what was going to happen when you got there; or can you recall?

A. Yes, I asked, I asked if this bud we were picking up is good bud. And both [Flatley] and [Janacaro] said, "Yeah, it's excellent bud." And [Flatley] made a statement that he used to always have bud on hand, but the cops are watching him now. And so now he only hooks people up.

¶8 When the group arrived in Jefferson City, Barkell parked the car at Ting's Bar. Flatley and Janacaro exited the car and walked to Justin Jones' house, while Barkell and Real waited in the car. Jones was not home, but his mother said he was at the dredge ponds. After Flatley and Janacaro returned to the car, Barkell drove to the dredge ponds. According to Barkell, both Flatley and Janacaro directed him to the ponds. He testified:

A. Both [Flatley] and [Janacaro] were telling me the way to go to the dredge pond. "Turn around here, go up this dirt road, take a right at the stop sign."

Q. Was it kind of a landmark in Jefferson City?

A. The dredge pond?

Q. Yes.

A. I-Apparently, I guess.

When they arrived at the dredge ponds, Janacaro went to talk with Jones, while Flatley, Real, and Barkell remained in the car. Janacaro then returned to the car with Jones, where Janacaro introduced Jones to Barkell. Janacaro and Jones entered the car and Barkell drove back to Ting's bar.

¶9 Once at Ting's bar, Barkell gave Janacaro $65. Jones and Janacaro then exited the car. Flatley, Real, and Barkell remained in the car. Janacaro testified that he and Jones then went to Jones' house, where Jones gathered a quarter ounce of marijuana. Jones and Janacaro returned about 15 minutes later. Jones then gave Barkell a bag of marijuana which he placed under his seat. Jones and Janacaro remained in Jefferson City and Real, Flatley, and Barkell departed for Boulder. While driving to Boulder, Barkell testified the following conversation occurred:

A. I took it and I put it under my seat. And then as we were driving back to Boulder, [Flatley] asked me to see it. I handed him a baggy. He smelled it and handed it back to me, and I put it back under my seat.

Q. Did he say anything after he smelled it?

A. He said, "This is good bud."

Q. Okay.

A. Or skunk bud. Skunk bud I believe.

When they arrived in Boulder, Real and Barkell returned Flatley to his house.

## STANDARD OF REVIEW

¶10 We review the sufficiency of the evidence to support a criminal conviction to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Medrano* (1997), 285 Mont. 69, 73, 945 P.2d 937, 939.

## DISCUSSION

¶11 Did the District Court err when it denied the Defendant's motion to dismiss based on insufficient evidence?

¶12 "A person commits the offense of criminal distribution of dangerous drugs if the person sells, barters, exchanges, gives away, or offers to sell, barter, exchange, or give away any dangerous drug, as defined in 50-32-101." Section 45-9-101(1), MCA. Section 45-2-301, MCA, provides:

> A person is responsible for conduct which is an element of an offense if the conduct is either that of the person himself or that of another and he is legally accountable for such conduct as provided in 45-2-302, or both.

A person is legally accountable for the conduct of another when:

> (3) either before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense.

Section 45-2-302(3), MCA. To convict a person of criminal distribution of dangerous drugs by accountability, the state must prove the defendant promoted or facilitated the sale of drugs. *State v. Lyons* (1992), 254 Mont. 360, 366, 838 P.2d 397, 401. Mere presence at the scene of a crime is, however, insufficient to establish criminal responsibility. *State ex rel. Murphy v. McKinnon* (1976), 171 Mont. 120, 125, 556 P.2d 906, 909 (holding that the defendant's presence during a deliberate homicide was insufficient to hold him accountable, even though he said the victim "had this coming.")

¶13 Flatley contends that he did not arrange the drug transaction between Jones and Barkell; that he did not introduce Janacaro to Real or Barkell; and that the drug transaction between Barkell and Jones would have taken place whether or not he traveled to Jefferson City with Barkell, Real, and Janacaro. In reliance on *State v. Downing* (1989), 240 Mont. 215, 217, 783 P.2d 412, 414, the State responds that Flatley had the intent to facilitate the drug transaction between Barkell and Jones.

¶14 In *Downing*, an informant introduced Downing to an undercover agent, who asked

Downing if he could purchase drugs. *Downing*, 240 Mont. at 216, 783 P.2d at 413. Downing responded that he had no drugs, but that he would arrange for the agent to meet Ohl. Ohl also had no drugs, but said the he was expecting a shipment. The following day, the informant, the agent, and Downing drove to Ohl's house, where Ohl introduced the agent to Huskins, who sold the agent drugs for $110. *Downing*, 240 Mont. at 216, 783 P.2d at 413. In affirming Downing's conviction, we said:

> Viewing this evidence in the light most favorable to the prosecution, a reasonable jury could have found that [Downing] intended to aid in a drug sale by whomever had the drugs available. Downing's intent was not necessarily limited to a sale by Earl Ohl. [The agent] initiated an open invitation to purchase drugs from whomever Downing could contact. On the testimony presented, the fact that Ohl happened to be the most accessible dealer, would not preclude a jury from finding that [Downing] intended to abet a drug sale by some other individual.

*Downing, 240 Mont. at 219, 783 P.2d at 415.*

¶15 Unlike the defendant in *Downing*, who intended to facilitate a drug sale, even if not with the original provider, Flately only intended to connect Real with one person, and that person had gone fishing. No transaction occurred. "Accountability must be predicated upon a separate, underlying offense." *Downing*, 240 Mont. at 217, 783 P.2d at 414.

¶16 Real testified that after he asked Flatley to hook him up, Flately responded, "No, the guy's gone fishing." Janacaro testified that Flatley did not introduce him to Real; and that he offered to get Real drugs without being prompted by Flatley. A rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could not have found that Flatley purposely promoted or facilitated the sale of drugs by Jones to Barkell. It was Janacaro who facilitated the transaction between Barkell and Jones, not Flatley. Mere presence is insufficient to prove accountability. *See State ex rel. Murphy*, 171 Mont. at 125, 556 P.2d at 909.

¶17 Flatley waited in the car when Janacaro talked to Jones at the dredge ponds, and Flatley waited in the car when Janacaro and Jones went to retrieve the drugs at Jones' house. Further, there was no evidence that Flatley ever discussed the drug transaction with Jones. During the course of the evening, Flatley made statements which revealed his knowledge of drugs and the drug trade, but such knowledge does not amount to a criminal offense. Therefore, we conclude that the District Court erred when it denied the

Defendant's motion to dismiss based on insufficient evidence.

¶18 The Judgment of the District Court is reversed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

1. A wire is a recording device that is hidden under a person's clothing.